AARON J. ROMANO, ESQ.
By: Aaron J. Romano #20100
45 Wintonbury Avenue, Suite 107
Bloomfield, CT 06002
(860) 286-9026

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANE DOE | : | CASE NO. |
| Plaintiff, | : | |
| | : | **COMPLAINT FOR VIOLATION OF** |
| v. | : | **CIVIL RIGHTS; 42 U.S.C. § 1983** |
| | : | |
| CONNECTICUT DEPARTMENT OF | : | |
| CORRECTIONS; JAMES DZURENDA, | : | |
| COMMISSIONER; CONNECTICUT | : | |
| DEPARTMENT OF CHILDREN AND | : | |
| FAMILIES; JOETTE KATZ, | : | |
| COMMISSIONER | : | APRIL 9, 2014 |

## JANE DOE'S[1]
## COMBINED APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT THEREOF

Plaintiff Jane Doe, through undersigned counsel, moves this Court for entry of a Temporary Restraining Order ("TRO") pursuant to Federal Rule of Civil Procedure 65 against the above-captioned Defendants, on the grounds set forth below and in the concurrently filed Complaint, until this Court may hold a hearing.

1. Plaintiff Jane Doe is a sixteen year old male to female transgender youth currently in the custody of the Connecticut Department of Children and Families (hereinafter "DCF" or "Department").

2. Jane Doe has been involved with DCF since she was five years old and is committed

---

[1] Plaintiff has filed a Motion for Leave to File Complaint as Pseudonymous Plaintiff and Memorandum of Law in Support Thereof contemporaneously herewith.

1

to DCF as the result of both child protection and juvenile delinquency proceedings.

3. On November 21, 2013, Jane Doe was committed delinquent to the DCF for a period not to exceed eighteen months.

4. Jane Doe was originally placed residentially in Massachusetts, but subsequently was involved in an incident with a staff member there and returned to Connecticut. She was placed at the Connecticut Juvenile Training School (hereinafter "CJTS") on January 31, 2014.

5. On or about February 4, 2014, the DCF filed a motion under C.G.S. §17a-12[2] requesting court approval to transfer Jane Doe to a corrections facility, Manson Y.I., a prison which

---

[2] C.G.S. § 17a-12, Transfer of child or youth to other program, agency, organization or facility, reads in pertinent part:
(a) When the commissioner, or the commissioner's designee, determines that a change of program is in the best interest of any child or youth committed or transferred to the department, the commissioner or the commissioner's designee, may transfer such person to any appropriate resource or program administered by or available to the department, to any other state department or agency, or to any private agency or organization within or without the state under contract with the department; provided no child or youth voluntarily admitted to the department under section 17a-11 shall be placed or subsequently transferred to the Connecticut Juvenile Training School; and further provided no transfer shall be made to any institution, hospital or facility under the jurisdiction of the Department of Correction, except as authorized by section 18-87, unless it is so ordered by the Superior Court after a hearing. When, in the opinion of the commissioner, or the commissioner's designee, a person fourteen years of age or older is dangerous to himself or herself or others or cannot be safely held at the Connecticut Juvenile Training School, if a male, or at any other facility within the state available to the Commissioner of Children and Families, the commissioner, or the commissioner's designee, may request an immediate hearing before the Superior Court on the docket for juvenile matters where such person was originally committed to determine whether such person shall be transferred to the John R. Manson Youth Institution, Cheshire, if a male, or the Connecticut Correctional Institution, Niantic, if a female. The court shall, within three days of the hearing, make such determination. If the court orders such transfer, the transfer shall be reviewed by the court every six months thereafter to determine whether it should be continued or terminated, unless the commissioner has already exercised the powers granted to the commissioner under section 17a-13 by removing such person from the John R. Manson Youth Institution, Cheshire or the Connecticut Correctional Institution, Niantic. Such transfer shall terminate upon the expiration of the commitment in such juvenile matter.

2

houses male offenders 14-21 years of age.

6. In response, Jane Doe filed a Motion to Dismiss based on the violation of her due process rights, that the statute, C.G.S. §17a-12, was void for vagueness, and that the plea Jane Doe entered was not knowing and intelligent.

7. This motion was denied by the juvenile court (Kaplan, J.). Testimony was taken in support and in opposition to the Motion for Transfer and on April 8, 2014, the Court, (Kaplan, J.) ordered Jane Doe transferred to the female correctional institute, York Correctional Institution (hereinafter "York C.I."), for evaluation and classification by the Department of Correction. The Court's order requires the Commissioner of Correction to make his own placement determination: at the Manson Y.I. if he determines Jane Doe to be male, or at York C.I. if he determines that she is female. At either Manson Y.I. or York C.I., it is anticipated that Jane Doe will be housed in isolation. Currently, Jane Doe is being housed at York C.I. in isolation and/or segregation and restrained by shackles.

8. Prior to DCF's initiation of the Motion for Transfer, the Department recognized Jane Doe's female gender identity. Currently, Department social workers and other Department personnel refer to Jane Doe as a female and accept her chosen gender identity.

9. On March 26, 2014, testimony was provided by Jody Marksamer, an expert on transgender youth and the juvenile justice system regarding the harm and threat of harm that transgender youth suffer when they are housed in correctional settings which do not reflect their gender assignment. Transgender youth frequently suffer from isolation in their community and families, and in a correctional setting, may be the targets of sexual abuse if placed in housing units inapposite to their gender identity. Despite the well documented potential for harm and the

availability of alternate placement options, the Department sought to remove Jane Doe to a male correctional facility, and the Commissioner of Corrections may indeed effectuate that placement pursuant to the Juvenile Court's Order.

10. In 2003, Congress passed the Prison Rape Elimination Act (hereinafter "PREA"), 42 U.S.C.A. §15061 et seq. The purpose of PREA is provide for the analysis of the incidence and effects of prison rape in Federal, State, and local institutions and to provide information, resources, recommendations and funding to protect individuals from prison rape. See 42 U.S.C.A. § 15602.

11. In enacting PREA, Congress specifically found, "Juveniles are 5 times more likely to be sexually assaulted in adult rather than juvenile facilities--often within the first 48 hours of incarceration." 42 U.S.C.A. § 15601(4).

12. Connecticut's juvenile justice system is charged with acting in the best interest of the child. See C.G.S. §46b-121h. This differentiation between adult offenders and juvenile delinquents is similarly reflected in the passage of the Juvenile Justice and Delinquency Prevention Act (JJDPA) 42 USC §5601 et. seq.

13. One of the mandates of the juvenile justice system is to "create and maintain programs for juvenile offenders that are gender specific in that they comprehensively address the unique needs of a targeted gender group." C.G.S. §46b-121h(11).[3] Recognizing that "targeted gender groups" have "unique needs," certainly, in a correctional setting and placed in isolation, the particularized needs of transgender youth will not be appropriately therapeutically addressed and

---

[3]The unique needs of transgender youth and adolescents may be found in The Standards of Care for the Health of Transsexual, Transgender, and Gender Non-conforming People Vol. 7, International Journal of Transgenderism, 13:165-232, 2011, *available at* http://www.wpath.org/uploaded_files/140/files/IJT%20SOC,%20V7.pdf

4

provide no substitute for the Juvenile Justice System.

14. In addition, Jane Doe's Eighth Amendment Right to be free of cruel and unusual punishment will be violated if she is placed in a male correctional facility and/or housed in isolation at an adult correctional facility.[4] As articulated by the United States Supreme Court, Jane Doe does not have to wait until she actually suffers harm to seek relief. Defendants are aware and are disregarding the excessive risk to Doe's health and safety. Farmer v. Brennan, 511 U.S. 825, 837, 843 (1994) (Bureau of Prison's held liable after placing transgender inmate in male prison population. Test for deliberate indifference is where prison officials exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health' citing Helling v. McKinney, 509 U.S. 25, 35 (1993). A prison official can be found liable under the Eighth Amendment if the official "knows of and disregards an excessive risk to inmate health or safety…" Farmer, 511 U.S. at 837. Such knowledge may be inferred where the risk of harm is obvious. Id at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact … and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). If Doe is placed at Manson Y.I., the Defendants will be acting in a deliberately indifferent manner to potential prison attacks against Doe by other male inmates. Defendants, by their actions, will deny Doe of the rights and protections provided by the Eighth Amendment of the United States Constitution. Further, the conditions of her incarceration will violate the Fourteenth Amendment. See e.g., A.J. v. Kierst, 56 F.3d 849, 854 (8th Cir. 1995); Gary H. v. Hegstrom, 831 F.2d 1430, 1431-32 (9th Cir. 1987); H.C. ex rel. Hewett v. Jarrard, 786 F.2d 1080, 1084-85 (11th

---

[4]This right applies to the States through the Fourteenth Amendment to the United States Constitution.

Cir. 1986); Alexander S. v. Boyd, 876 F. Supp. 773, 795-96 (D. S.C. 1995).

15. For women, particularly transgender women in men's facilities, assault is tragically common. According to the recent National Transgender Discrimination Survey, of the 6,450 transgender respondents who had been incarcerated, 37% reported being harassed by officers or staff, 16% reported physical assault by other inmates or staff, and 15% reported sexual assault by other inmates or staff.[5] A study of California prisons found that 59% of transgender respondents reported sexual assault, as compared with 4.4% of non-transgender respondents.[6]

16. Courts are increasingly confronted with constitutional claims by transgender people who have been assaulted while in custody. See e.g., Green v. Hooks, No. 13-cv-17, 2013 WL 4647493 (S.D. Ga. Aug. 29, 2013) (claim brought by transgender woman when she was incarcerated at a men's facility and was assaulted by other inmates); Lee v. Eller, No. 13-cv-00087, 2013 WL 4052878 (S.D. Ohio, Aug. 12, 2013) (same); Tate v. Lynch, No. 13-cv-3060, 2013 WL 2896885 (C.D. Ill., June 13, 2013) (same).

17. Incarcerating Jane Doe at Manson Y.I. with male offenders poses an objectively serious risk of harm. Jane Doe has been receiving hormone therapy and has developed breasts. She will be subjected to sexual harassment, threats of physical and sexual violence, and psychological trauma. Where transgender females have been placed in male facilities, they have invariably been

---

[5] Jamie M. Grant, Ph.D., *et al.*, Injustice at Every Turn: A Report of the National Transgender Discrimination Survey 166-67 (2011), *available at* http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.

[6] Valerie Jenness, Ph.D., The California Department of Corrections and Rehabilitation Wardens' Meeting at 34 (April 8, 2009), *available at* http://ucicorrections.seweb.uci.edu/files/2013/06/Transgender-Inmates-in-CAs-Prisons-An-Empirical-Study-of-a-Vulnerable-Population.pdf (last visited Feb. 27, 2014).

subjected to abuse. In one case for example, the plaintiff was forced to reveal her breasts to detainees, urinate in front of male detainees who masturbated when they saw her vagina, and undergo public strip searches by male officers. Some detainees groped her, and others threw what appeared to be semen at her. See Shaw v. Kates, Amici Brief, No. 13-5212 (7th Cir. 2013).

18. Incarcerating Jane Doe at an adult facility in isolation provides no remedy and in fact, is equally as harmful. Youths confined with adults are more likely to be physically or sexually abused, and to commit suicide than those in juvenile facilities. See Emily Ray, Comment, Waiver, Certification and Transfer of Juveniles to Adult Court: Limiting Juvenile Transfers in Texas, 13 Scholar 317, 320 (2010). In fact, suicide is the number one cause of death for juveniles in adult jails. Margaret Noonan, U.S. Dep't of Justice, Mortality in Local Jails, 2000-2007 9(2010). Attempts by facilities' staff to protect youth, generally by placing youth in isolation or administrative segregation, can cause even further damage:

> An individual held in solitary confinement for 23 hours a day typically begins to lose his sense of reality, and becomes paranoid, anxious and despondent, all of which can exacerbate existing mental health conditions. Given that many of the youth being held in adult jails have experienced some serious trauma in their lives or have undiagnosed or untreated mental illness, they are particularly vulnerable. Terry F. Hickey & Camilla Roberson, Pretrial Detention of Youth Prosecuted as Adults, 44-Dec Md. B.J. 44, 48(2011).

19. Courts are clear that a detainee held in unsafe conditions need not suffer an actual assault before her constitutional rights are violated. Courts have found that serious harm may result regardless of the occurrence of assault or rape. See Chandler v.12 District of Columbia Dept. of Corr., 145 F.3d 1355, 1360 (D.C. Cir. 1998) (noting that "verbal threats, without more, may be sufficient to state a cause of action under the Eighth Amendment"). Threat or coercion is clearly sufficient to a state a claim. See Hudson v. McMillian, 503 U.S. 1, 6-7 (1992); see also Hostetler v.

7

Green, 323 F. Appx 653, 659 (10th Cir. 2009) ("an inmate has an Eighth Amendment right to be protected against prison guards taking actions that are deliberately indifferent to the substantial risk of sexual assault by fellow prisoners"); Ramos v. Lamm, 639 F.2d 559, 572 (10th Cir.1980) ("[A]n inmate does have a right to be reasonably protected from constant threats of violence and sexual assaults from other inmates."); R.G. v. Koller, 415 F. Supp. 2d 1129, 1157 (D. Haw. 2006) (facility was physically and psychologically unsafe for LGBT youth, who was teased and threatened with sexual assault). Courts have also held that forced exposure of one's genitals is not reasonable and is particularly problematic where a woman is forced to reveal her vagina and breasts to male prisoners and guards. See e.g., Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1981) ("Most people ... have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.... [T]hat sort of degradation is not to be visited upon those confined in our prisons."); Fortner v. Thomas, 983 F.2d. 1024, 1030 (11th Cir. 1993) (quoting Lee v. Downs and joining other circuits in recognizing a prisoner's constitutional right to bodily privacy); Boss v. Morgan County, Mo., No. 08-cv-04195, 2009 WL 3401715 at *5 (W.D. Mo., Oct. 20, 2009) (officers denied qualified immunity where "an inmate using the toilet" was exposed "to law enforcement personnel, jailers, cafeteria workers, and inmates of the opposite sex").

20. The risk of harm posed by placing Jane Doe in an all male facility in the men's area of a cellblock or directly in a unit with men, transporting her chained to men and having her searched by male guards, is obvious. Although the transgender process is a gradual transition, Jane Doe has consistently expressed a female gender identity, has been acknowledged by the committing agency as female, informs all personnel who interact with her that she is female, and has developed breasts.

8

21. There is also a great risk of harm posed by placing Jane Doe in isolation or segregation at an adult correctional facility. The end result of a juvenile delinquency case is not simply punishment but, based upon state statute, some form of rehabilitation combined with protection of the public. As recognized by the Supreme Court in both Roper v. Simmons, 543 U.S. 551 (2005) and Graham v. Florida, 560 U.S. 48 (2010), juveniles are both more vulnerable to pressures and more malleable than adults. This means that the effects of a harmful condition may take a unique toll on a juvenile, even when the same punishment is constitutional for an adult. For example, such practices as isolation or strip-searching may inflict heightened trauma on youth. Similarly, the failure to provide education and rehabilitation may be particularly harmful to a juvenile by depriving him or her of the opportunity for age-appropriate growth and development. Indeed, even before Roper, courts recognized that certain institutional conditions might be unconstitutional as applied to a juvenile even when they fall within constitutional bounds for an adult. A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Detention Ctr., 372 F.3d 572 (3d Cir. 2004).

Recently, the United States District Court for New Jersey explicitly recognized that juvenile status may impact the protections owed to incarcerated individuals, and that isolation of youth may be unconstitutional even if it would be constitutional for adults. Troy D. v. Mickens, No. 10-2092, 2011 WL 3793920, at *12 (D.N.J. Aug. 25, 2011). This recognition of the unique harm to youth is consistent with developmental research on adolescent vulnerability, specifically in the areas of emotion regulation and independent functioning. Harsh penalties imposed on juveniles are likely to evoke a range of negative emotions (e.g., anger, fear, distress) that adolescents cannot effectively regulate, thereby leading to psychological distress and potentially psychopathology. See Elizabeth Thompson Gershoff, Corporal Punishment by Parents and Associated Child Behaviors and

Experiences: A Meta-Analytic and Theoretical Review, 128 Psychol. Bull. 539, 542, 554 (2002). Further, this type of treatment could undermine adolescents' developing sense of self by evoking a sense of powerlessness and challenging their bodily integrity. For youth who have experienced trauma, the vulnerability is even further magnified. See Sandra Bloom, Creating Sanctuary: Towards the Evolution of Sane Societies 25-33 (1997).

22. "The purpose of a temporary restraining order is to preserve an existing situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." (Internal citations and quotations omitted) Garcia v. Yonkers School Dist., 561 F.3d 97, 107 (2d. Cir. 2009).

23. "In order to obtain such relief, a party must demonstrate: (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) a sufficiently serious question going to the merits and a balance of hardships tipping decidedly in the moving party's favor." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Reidy, 477 F. Supp. 2d 472, 474 (D. Conn. 2007) citing Brennan's, Inc. v. Brennan's Restaurant, L.L.C., 360 F.3d 125, 129 (2d Cir.2004).

24. Jane Doe will inevitably suffer irreparable harm if placed in a male correctional facility and/or in isolation. Currently Jane Doe, while being housed at a female adult correctional facility, she is in isolation and restrained with shackles. As articulated above, Jane Doe's juvenile and transgender status require specialized consideration and corresponding protections.

25. Jane Doe is also likely to succeed on the merits of her claim. A review of the legal issues demonstrates the Constitutional deprivation that will occur if Jane Doe is placed in a male correctional facility and/or in isolation. First, the Constitutional analysis must consider the goals of the juvenile justice system under C.G.S. §46b-121h. "An offender's age," we made clear in Graham,

"is relevant to the Eighth Amendment," and so "criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." Id., at ——, 130 S.Ct., at 2031. Miller v. Alabama, 132 S.Ct. 2455, 2466 (2012). The Fourteenth Amendment's more deferential standard, which applies to juvenile justice cases, will be offended by Jane Doe's placement in a correctional setting designed for an inapposite gender and/or in isolation. With the passage of the PREA and C.G.S. §46a-64 and 51, gender identity is a factor that must also be considered by DCF, the Department of Corrections (hereinafter "DOC"), and the underlying court in placing Jane Doe in a female rehabilitative facility.[7]

> The prohibition against "cruel and unusual punishments," like other expansive language in the Constitution, must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design. To implement this framework we have established the propriety and affirmed the necessity of referring to "the evolving standards of decency that mark the progress of a maturing society" to determine which punishments are so disproportionate as to be cruel and unusual. Trop v. Dulles, 356 U.S. 86, 100–101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion). Roper v. Simmons, 543 U.S. 551, 560-561 (2005)

It is obvious that harm will occur to a transgender child if she is placed in a male correctional facility and/or housed in isolation, and such placement is *a fortiari* done with deliberate indifference to that harm. The placement made under the auspices of the juvenile court system, whose mandate is the best interest of the child, will only serve to offend the Eighth and Fourteenth Amendments of

---

[7] 18 CFR 115.42 (c): "in deciding whether to assign transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety..."
C.G.S. §46a-51: "Gender identity or expression" means a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth, which gender-related identity can be shown by providing evidence including, but not limited to, medical history, care or treatment of the gender-related identity, consistent and uniform assertion of the gender-related identity or any other evidence that the gender-related identity is sincerely held, part of a person's core identity or not being asserted for an improper purpose."

the United States Constitution.

26. With respect to the seriousness of the question going to the merits, recent litigation reveals the need for a Fourteenth Amendment standard to be articulated in cases such as this. The Supreme Court has never squarely established the constitutional standard for juvenile cases. See Ingraham v. Wright, 430 U.S. 651, 669 (1977). Conditions of confinement for juveniles have been tested under the more rigorous Fourteenth Amendment standard, however, the precise contours of that right have not been articulated. Gary H., 831 F.2d at 1432 ("Where...an institution is noncriminal and nonpenal, allegations of unconstitutional conditions of confinement are governed by the more protective standard of the Fourteenth Amendment, rather than the Eighth Amendment); Nelson v. Heyne, 491 F.2d 352, 357, 360 (7th Cir. 1974)(Eighth Amendment right was violated where child was beaten and involuntarily administered drugs, as well as Fourteenth Amendment due process right by failure to provide juvenile with treatment); Santana v. Collazo, 714 F.2d 1172, 1177, 1179 (1st Cir. 1983) (conditions of confinement must be analyzed under the Fourteenth Amendment). The majority of jurisdictions have applied the Fourteenth Amendment to juvenile conditions cases, however, there is no consistent standard. See e.g., A.J. v. Kierst, 56 F.3d 849, 854 (8th Cir. 1995); Gary H. v. Hegstrom, 831 F.2d 1430, 1431-32 (9th Cir. 1987); H.C. ex rel.Hewett v. Jarrard, 786 F.2d 1080, 1084-85 (11th Cir. 1986); Alexander S. v. Boyd, 876 F. Supp. 773, 795-96 (D. S.C. 1995). The need for such a standard to be articulated weighs in favor of this application.

27. With respect to the balance of hardships, in this case DCF and DOC, government agencies, will not suffer any hardship should the application be granted. As articulated above, Jane Doe will suffer harm from being incarcerated at a male facility and/or in isolation.

28. Should this application be granted, it would merely leave in place the *status quo*

during the pendency of an appeal. A stay of the present order would not, however, prevent the parties from working with the Department to fashion an appropriate disposition. For instance, nothing in an order of stay of the present trial court's order requires that the juvenile reside in a juvenile detention center; the parties can continue to work on appropriate dispositional plans that would obviate the need for juvenile detention center placement and rather, therapeutic treatment for the child.

29. Exhaustion in this case is not warranted as there is an imminent threat to Jane Doe's mental and physical well-being, making the issuance of this temporary restraining order necessary. See Marvin v. Goord, 255 F. 3d 40, 43 (2d Cir. 2001)(Suggesting there may be an irreparable harm exception to the exhaustion requirement). See also Evans v. Saar, ___ F.Supp.2d ___, 2006 WL 274476 at *7 (D.Md., Feb. 1, 2006) (declining to dismiss for non-exhaustion, given "shortness of time," where plaintiff challenged the protocol for his impending execution and the grievance process was not complete); Howard v. Ashcroft, 248 F.Supp.2d 518, 533-34 (M.D.La. 2003) (holding that prisoner fighting transfer from community corrections to a prison need not exhaust where appeal would take months and prison officials wanted to transfer her despite any pending appeal); Ferguson v. Ashcroft, 248 F.Supp.2d 547, 563-64 (M.D.La. 2003) (same as Howard); Borgetti v. Bureau of Prisons, 2003 WL 743936 at *2 n.2 (N.D.Ill., Feb. 14, 2003) (holding that "the court's jurisdiction is secure" to decide a case in which the prisoner sought immediate injunctive relief and exhaustion would almost certainly take longer than the remainder of his sentence).

30. In the alternative, this Court may exercise its traditional equitable discretion to great temporary relief to maintain the status quo pending exhaustion. See Jackson v. District of Columbia, 254 F. 3d 262, 2670-268 (D.C. Cir. 2001).

31. Opposing counsel for DCF and DOC have been provided with a copy of this Application for Temporary Restraining Order, Complaint, Motion for Leave to File Complaint as Pseudonymous Plaintiff and Memorandum of Law in Support Thereof.

**WHEREFORE**, the Plaintiff respectfully prays that this Court ORDER and DECREE that:

1. DCF and DOC be enjoined from transferring Jane Doe to Manson Y.I. or housing her in a correctional or residential facility designed for males.

2. DCF and DOC be enjoined from transferring Jane Doe to a correctional or residential facility where she will be housed in isolation and/or segregation.

3. This Order expires in 14 days or as modified by the Court.

this 9th day of April 2014

Respectfully submitted,
JANE DOE,

By: /s/ Aaron J. Romano
Aaron J Romano, Esq.
Her Attorney, Bar ID #20100
Aaron J. Romano, P.C.
45 Wintonbury Ave., Suite 107
Bloomfield, CT 06002
Tel (860) 286-9026/Fax (860) 286-9028
AaronRomano@attorneyaaronromano.com

## CERTIFICATION

I hereby certify that, on this 9th day of April 2014, the foregoing Combined Application for Temporary Restraining Order and Memorandum in Support Thereof was filed electronically and sent electronically and by first class postage prepaid to the following parties:

Attorney James Connolley
Attorney Lindsey Guerrero
Office of the Public Defender
30 Trinity Street, Hartford, CT 06106

Assistant Michael Besso
Attorney Lorri Kirk
Attorney Terrance O'Neil
Attorney Steven Strom
Office of the Attorney General
110 Sherman Street
Hartford, Connecticut, 06105

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system, or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

By: /s/ Aaron J. Romano
Aaron J. Romano, Esq. Bar ID # 20100
45 Wintonbury Avenue, Suite 107
Bloomfield, CT 06002
Tel (860) 286-9026/Fax (860) 286-9028

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANE DOE | : | CASE NO. |
|     Plaintiff, | : | |
| | : | **COMPLAINT FOR VIOLATION OF** |
| v. | : | **CIVIL RIGHTS; 42 U.S.C. § 1983** |
| | : | |
| CONNECTICUT DEPARTMENT OF | : | |
| CORRECTIONS; JAMES DZURENDA, | : | |
| COMMISSIONER; CONNECTICUT | : | |
| DEPARTMENT OF CHILDREN AND | : | |
| FAMILIES; JOETTE KATZ, | : | |
| COMMISSIONER; | : | |

# ORDER

FOR GOOD CAUSE SHOWN, Jane Doe's Application for Temporary Restraining Order is hereby GRANTED/DENIED. As per Federal Rules of Civil Procedure 65(d)(1):

A) Reasons why Temporary Restraining Order was Issued:

B) Specific terms of the Temporary Restraining Order:

C) The act(s) restrained or required:

_____
J.,